*Tagged opinion*



**ORDERED in the Southern District of Florida on August 22, 2023.**

**Laurel M. Isicoff**
**Chief United States Bankruptcy Judge**

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
www.flsb.uscourts.gov

In re:

Austin Brode Howard,

      Debtor.

_____/

Chris M. Carlos, as trustee for the
Chris M. Carlos Revocable Trust dated
May 28, 2008, as amended and restated,


      Plaintiff,

v.

Austin Brode Howard,

      Defendant.

_____/

Case No.  22-11866-LMI
Chapter 7



Adv. Pro. No. 22-01194-LMI


**MEMORANDUM OPINION ON**
**<u>NON-DISCHARGEABILITY OF CERTAIN DEBTS</u>**

      This matter came before the Court for trial on February 14-16, 2023 (the

"Trial"). Chris M. Carlos ("Carlos"), as trustee for the Chris M. Carlos Revocable

Trust dated May 28, 2008, as amended and restated (the "Carlos Trust" or "Plaintiff") commenced this Adversary Proceeding seeking denial of Austin Brode Howard's ("Howard" or the "Debtor" or the "Defendant") chapter 7 discharge with respect to the claims of the Carlos Trust. The Plaintiff's Adversary Complaint seeks exceptions from discharge under 11 U.S.C. §§523(a)(2)(A), 523(a)(4), and 523(a)(6) (ECF #1) (the "Complaint").

The issue before the Court is whether a car broker/dealer who has, admittedly, taken or withheld money from a client, can avoid the consequences of those decisions with impunity.  The answer is "no." For the reasons set forth below, the Court finds that Howard is indebted to the Carlos Trust in the amount of $755,745.00, and that the entire amount is non-dischargeable in accordance with sections 523(a)(2)(A), 523(a)(4), and 523(a)(6) of the Bankruptcy Code.

## A BRIEF HISTORY

As more detailed in the Court's findings of fact laid out below, Howard and Carlos bonded over expensive cars.  They became friends – close friends – until an incredible falling out.  Howard claims that everything that Carlos and the Carlos Trust have done is revenge for Howard refusing to sign a non-disclosure agreement.  The Carlos Trust argues that everything it has done is a consequence of discovering the Debtor defrauded the Carlos Trust in the manner described in the Complaint and presented at the Trial. A review of the evidence at Trial illustrates a pattern of shell games with Howard using the Carlos Trust cars to

provide funds through the floorplan financing made available to Howard's various companies by NextGear Capital ("NextGear").

The Debtor filed a chapter 7 bankruptcy petition on March 8, 2022 (the "Petition Date"). On June 21, 2022 the Carlos Trust filed its five-count Complaint, seeking a determination of the non-dischargeability of three separate debts under sections 523(a)(2)(A), 523(a)(4), and 523(a)(6) of the Bankruptcy Code in the following amounts: (a) $563,835.00 (the "Phantom Debt"); (b) $91,910.00 (the "Vehicle Sales Debt") and $100,000.00 (the "Contempt Debt") (the Phantom Debt, Vehicle Sales Debt, and the Contempt Debt are collectively referred to as the "Claim").[1]

After an unsuccessful Motion to Dismiss[2], the Debtor filed his Answer and Affirmative Defenses[3], some of which were eliminated after this Court's ruling on the Plaintiff's Motion for Partial Summary Judgment[4]. Trial proceeded on the Complaint and the Affirmative Defenses.

---

[1] The Complaint sought other related relief which will be addressed herein.

[2] On August 22, 2022 the Debtor filed *Defendant's Motion to Dismiss Adversary Complaint for Failure to State a Cause of Action* (ECF #15) (the "Motion to Dismiss") which the Court denied on October 14, 2022. *Order Denying Defendant Austin Howard's Motion to Dismiss* (ECF #37).

[3] *Defendant's Answer and Affirmative Defenses* (ECF #45) filed on November 2, 2022.

[4] On December 12, 2022, the Carlos Trust moved for entry of partial summary judgment as to most of the Debtor's affirmative defenses. *Plaintiff Carlos Trust's Motion for Partial Summary Judgment* (ECF #67) (the "Motion for Partial Summary Judgment"). On February 1, 2023, the Court granted in part and denied in part the Motion for Partial Summary Judgment leaving the following as the only remaining affirmative defenses: reliance on advice of counsel, setoff, recoupment, unjust enrichment, equitable estoppel, and promissory estoppel (the "Affirmative Defenses"). *Order Granting in Part and Denying in Part Plaintiff Carlos Trust's Motion for Partial Summary Judgment* (ECF #111).

## FINDINGS OF FACT[5]

The Court has considered all of the evidence presented, including the joint stipulation of the parties, the testimony at Trial, the deposition designations, and the admitted exhibits.[6] Based on all of the foregoing, the Court makes the following findings of fact.

Carlos is the Trustee of the Carlos Trust. All the cars or money that are the subject of the Complaint were purchased by, or provided by, the Carlos Trust.

The Motorcar Collection Miami Corp., a Florida corporation ("Motorcar Miami"), The Motorcar Collection, LLC, a Georgia Limited Liability Company ("Motorcar Atlanta"), and Collection Miami, LLC, a Florida Limited Liability Company ("Collection Miami", and collectively with Motorcar Miami and Motorcar Atlanta, the "Howard Entities"), each specialized in the purchase and sale of luxury automobiles.

Howard created Motorcar Atlanta in 2010 in Atlanta, Georgia. Howard created Motorcar Miami on March 28, 2020. Motorcar Miami was licensed by the Florida Department of Highway Safety and Motor Vehicles ("DMV") as a motor vehicle dealer from June 2020 through April 2022. Howard created Collection Miami on September 10, 2020. Collection Miami was never licensed as a motor

---

[5] The findings of fact and conclusions of law set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure ("Fed. R. Bankr. P."). To the extent any of the following findings of fact are determined to be conclusions of law, they are adopted, and shall be construed and deemed, as conclusions of law. To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted, and shall be construed and deemed, as findings of fact.

[6] The Court again thanks and commends counsel for the hard work they did stipulating as much as possible both regarding undisputed facts and the admissibility of exhibits at Trial. Such work reflects highly on all counsel involved, and the level of professionalism to which all attorneys should aspire.

vehicle dealer. Howard claims that Collection Miami was "doing business as" Motorcar Miami, but Motorcar Miami's dealer renewal application, submitted in April 2021, does not disclose Collection Miami as a d/b/a; that entity had a separate bank account as of May 2021.

Mr. Howard was the sole owner and operator of the Howard Entities. While Motorcar Atlanta had, at one time, up to 16 employees, Motorcar Miami had only one employee[7] in addition to Howard.

Carlos, through the Carlos Trust, started purchasing cars from Howard, through Motorcar Atlanta, around late 2017.  Howard, according to Carlos, handled everything to do with the cars, even cars that Carlos purchased elsewhere – title, tags, registration.  Howard does not dispute that.

Over the course of several years, the Carlos Trust purchased vehicles and often decided to customize such vehicles through the Howard Entities. Five of those purchased vehicles are integral to the allegations of the Complaint and the subject of the Trial –

    a.  A  2016 Rolls Royce Ghost (the "Ghost")

    b.  A 2004 Mercedes  E55 (the "Mercedes")

    c.  A 2011 Porsche Turbo (the "Porsche")

    d.  A white 2019 Ferrari 488 Spider with white leather interior (the "Ferrari")

    e.  A 2020 Rolls Royce Phantom (the "Phantom")

---

[7] It isn't clear whether the second person in Miami was an employee or an independent contractor; the distinction has no bearing on this ruling.

Most of the allegations of the Complaint and the evidence at Trial focus on how, notwithstanding that the Carlos Trust bought the vehicles, Howard did not transfer title to those vehicles[8]. Rather, Howard used the vehicles to finance his operations, and, allegedly, his personal expenses, while keeping a special rating for his financing.

Motorcar Atlanta had secured floorplan financing from NextGear, a subsidiary of Cox Automotive ("Cox"), and the sister company of Manheim Remarketing, Inc. ("Manheim") through which auto auction Motorcar Atlanta purchased many of its vehicles. Floorplan financing is a line of credit for dealer inventory that allows auto dealers to use a lender's money to finance their inventory in order to bridge the gap between the purchase and sale of vehicles. Up until the time those vehicles are sold to the end-user, the lender retains the vehicle titles. Howard was the personal guarantor of the floorplan financing loans from NextGear to Motorcar Atlanta. Howard testified that as part of the normal course of business, Motorcar Atlanta placed every vehicle in its inventory into the NextGear floorplan.

Over time, Carlos and Howard developed a close friendship that went beyond the purchase of cars. Not only were Howard and Carlos friends; Howard also became a friend to Carlos' family, and performed services for the family members as well. Howard ended up meeting, not just some of Carlos' family's

---

[8] The evidence is not clear whether title to the Mercedes and the Porsche were originally properly transferred, and then title transferred by the Carlos Trust to Motorcar Atlanta for the auction. What is clear is that Motorcar Atlanta used the Porsche to secure floorplan financing from NextGear while it had title to the Porsche. There is no evidence whether the Mercedes was ever used to secure floorplan financing.

business needs, but some of their personal needs as well. For example, in addition to a home in Atlanta, Carlos also owns a luxury condominium in Miami. Around late October 2020, Howard was engaged to perform condo management services for Carlos and Carlos paid separately for those services. Howard also did personal shopping for Carlos from time to time.

## THE GHOST

In February of 2019, the Carlos Trust purchased the Ghost from Motorcar Atlanta. In November 2020, the Ghost was stolen from a restaurant in Atlanta. The Carlos Trust made an insurance claim. The insurance company required certain information, including the title to the car. Howard was asked to help fill out paperwork that the insurance company required in connection with the theft, including providing the title, which Howard supposedly was holding on to for the Carlos Trust.

However, unbeknownst to the Carlos Trust, Howard had never transferred title of the Ghost to the Carlos Trust.[9] On February 22, 2019, after the Ghost was sold to the Carlos Trust, the Ghost was used as collateral by Motorcar Atlanta for a floorplan loan of $193,935.00. That financing was paid off on August 30, 2019. Then the Ghost was used again on September 24, 2019 for financing, which was paid off on April 28, 2020. The Ghost was used yet again for financing on June 9, 2020 and paid off on December 8, 2020.

---

[9] Unlike the "still deciding where to register" excuse Howard made for the Ferrari and the Phantom, Howard never provided any explanation or excuse why he did not register the title for the Ghost in the name of the Carlos Trust after it was purchased by the Carlos Trust.

Repeated demands were made over time to Howard to deliver the title of the Ghost to the insurance company.  During a phone conversation on March 12 or 13, 2021 with Lisa Harper, counsel to the Carlos Trust, Howard said the title documents for the Ghost were being processed, but Ms. Harper testified that during that conversation Howard never mentioned that the Carlos Trust did not already own the Ghost, or that the title to the Ghost had never been registered to the Carlos Trust.

The evidence at Trial shows that Howard did not deliver title to the Ghost until the Carlos Trust purchased the Ferrari.  At that point, Howard used the Ferrari to get an advance on the floorplan financing and apparently used that advance to pay NextGear to release its lien on the Ghost so that Howard could transfer the title from Motorcar Atlanta to Carlos Trust and finally deliver the title to the insurance company.

**THE FERRARI**

On or about November 4, 2020, a bill of sale reflecting Motorcar Miami as the seller, was delivered to the Carlos Trust, as buyer, for the purchase of the Ferrari. However, unbeknownst to the Carlos Trust, Howard did not transfer title of the Ferrari to the Carlos Trust. On November 11, 2020, after the Ferrari was sold to the Carlos Trust, Howard used the Ferrari to obtain financing from NextGear for $250,000.00.

Once the Ferrari arrived in Miami, Howard testified he allowed the Carlos Trust to drive on Motorcar Miami's dealer plates, and at the same time the Carlos Trust requested custom work to be performed on the Ferrari. Howard argued in

his closing that, like the Phantom, Carlos could not decide where to register the Ferrari, and so notwithstanding payment in full, the Ferrari title remained in the name of Motorcar Miami.[10]  Like the Ghost, and like the Phantom, Howard used the Ferrari after it was purchased by the Carlos Trust to secure a specific floorplan financing loan from NextGear.  In this instance, the Ferrari was apparently used to pay off the lien on the Ghost. The loan secured by the Ferrari was paid off on March 18, 2021, apparently with the financing that Howard got using the Phantom as more fully discussed later in this Opinion.

Ultimately, Howard executed the title to the Ferrari to the Carlos Trust after ordered to do so by the state court as more fully described below.

**THE PORSCHE AND THE MERCEDES**

In November 2020, Motorcar Atlanta sold the Mercedes, and in early December 2020, Motorcar Atlanta sold the Porsche, for the Carlos Trust through auction by Manheim. The net proceeds that were owed to the Carlos Trust for those sales total $91,910.00, and constitute the Vehicle Sales Debt.  Howard did not notify the Carlos Trust that the vehicles had been sold until April 12, 2021.

First Howard testified that he was holding the $91,910.00 as a "credit" to apply to a new car purchase for the Carlos Trust, something, Howard testified, he had done from time to time to save on taxes.  However, in that March 12 or 13, 2021 phone call with Lisa Harper, Howard told Ms. Harper that there was a

---

[10] The parties stipulate that the Carlos Trust agreed to pay for special order custom work for the Ferrari, although Carlos didn't seem to remember that when he testified.  The Debtor did not provide any testimony why or whether the custom work had anything to do with the delay in issuing title.

delay in getting the proceeds because of some kind of arbitration. That information turned out to be false.

Unbeknownst to the Carlos Trust, the Porsche had been subject to a NextGear loan and part of the sales proceeds were used to pay off the NextGear loan secured by the Porsche. Motorcar Atlanta paid that NextGear loan in December of 2020 when the Porsche was sold.

**THE PHANTOM**

In November 2020, the Carlos Trust wanted to buy a new 2020 Rolls Royce Phantom to replace the Ghost, and, as Carlos had in the past, he reached out to Howard to get a car, which Howard did. Howard purchased the Phantom from Holman Motorcars through Motorcar Miami as dealer. The Carlos Trust wired $563,835.00 to Motorcar Miami on November 20, 2020 as payment for the Phantom. Although the sale was purportedly through Motorcar Miami, Howard acquired the Phantom in the name of Collection Miami.

From the $563,835.00 Motorcar Miami received from the Carlos Trust, it paid Holman Motorcars $485,840.00 for the purchase of the Phantom. Then, on November 20, 2020, Motorcar Miami as seller executed a bill of sale for the Phantom to the Carlos Trust as buyer with an indicated purchase price of $563,835.00. The bill of sale does not include any taxes.

Howard delivered the Phantom to the Carlos Trust in late November 2020, and the Carlos Trust enjoyed full possession and use of the Phantom until March 2021. However, unbeknownst to the Carlos Trust or to Carlos, the Phantom was never titled in the name of the Carlos Trust. Collection Miami held title to the

Phantom from approximately December 15, 2020 until at least March 10, 2021.[11]

In February or early March 2021 Carlos requested that Howard sign a non-disclosure agreement ("NDA"), which Howard stated he would not do without consulting a lawyer. Howard testified that it was upon his refusal to immediately sign the NDA that Carlos got very angry and threatened him. Carlos testified that he had no problem with Howard asking an attorney to review the NDA before Howard signed it.

Around March 9, 2021, Howard took the Phantom for a "blackout" service requested by Carlos, in which all of the chrome on the Phantom would be coated black. Howard represented to Carlos that the blackout process would take 10 days to complete, and repeatedly sent assurances about the progress of the work, but Carlos never saw the Phantom again.

Howard testified that on March 12, 2021 Carlos called him screaming and said, "I'm going to kill you, I'm going to ruin you, I'm going to put liens on all your property, you're going to be nothing, et cetera." On March 12 or 13, 2021 during the same conversation with Lisa Harper previously described, Howard never mentioned that the Carlos Trust did not have title to the Phantom. Nor, according to Ms. Harper, did Howard state that Carlos had threatened him.

---

[11] Howard testified that Carlos had to know he didn't own the Phantom because Carlos was driving the Phantom with dealer plates. However, in addition to his testimony about the tax issue, Howard also testified he couldn't get plates for the Phantom because Carlos wanted his special license plate on the Phantom and there was a delay. Carlos, who seemed oblivious about a lot of details in his life, testified that he thought he (through the Carlos Trust) owned the car because he had paid for it in full, which he had. The Court finds that whether Carlos was aware that the Phantom had dealer plates did not mean he knew he didn't own the Phantom.

Finally, on March 17, 2021, Carlos fired Howard through an email from Ms. Harper; Carlos and the Carlos Trust demanded the Phantom be returned and that Howard turn over the condominium keys and fobs. Howard testified all of this was precipitated by his advising Carlos he would not sign the NDA. Carlos disagrees.

In addition, Howard refused to tell the Carlos Trust where the Phantom was located, what work was being done on the car, and who was actually doing the work.

In fact, it wasn't until the end of March 2021 that the Carlos Trust learned that it was not the titled owner of the Phantom. Ms. Harper testified that the first time she heard about taxes and the Phantom was on March 20, 2021. Carlos testified that during the time he was trying to get the car titled he "kept asking" for the invoice for the Phantom taxes but that at no time did Howard ever tell Carlos that he didn't own the car.

### THE STORIES COME APART

Howard did not provide the copies of the titles for the Ghost, the Ferrari, or the Phantom to the Carlos Trust, notwithstanding repeated requests. The reason Howard did not turn over the titles is because the titles were in the name of Howard Entities and not the Carlos Trust, something Howard hid from Carlos and the Carlos Trust.

For about three weeks, from March 17, 2021, through April 12, 2021, the Carlos Trust's counsel, and Howard, and his business entities' Georgia and

Florida counsel, exchanged correspondence setting forth the respective parties' positions with respect to the issues between them.

Carlos and Howard's relationship continued to deteriorate. In fact, on April 1, 2021, Howard obtained an Ex Parte Temporary Protective Order from a Fulton County Georgia court in connection with Howard's claimed safety concerns about threats from Carlos. [12]   However, the morning of the final hearing on the protective order, May 14, 2021, Howard dismissed the claim for a protective order.

On April 12, 2021, Howard's counsel sent a letter to the Carlos Trust's counsel attaching two invoices, marked "overdue," from Motorcar Miami, each bearing a date of February 9, 2021: one for $82,686.10 in taxes allegedly owed on multiple vehicles (the "Vehicle Tax Fees") and another for $106,635.99 for custom work and install fees on multiple vehicles (the "Custom Work Fees"), including the work on the Phantom, which, if performed, was not done until after Howard took the Phantom on March 9, 2021. Neither invoice was provided to the Carlos Trust before April 12, 2021. Requests by the Carlos Trust for support documentation for the summary invoices have never been provided by Howard.

---

[12] Howard testified that the day after he received the threatening phone call from Carlos, a man by the name of Steve Laughlin who worked for Carlos, approached Howard on the beach in Miami the morning when Howard was out walking his dog. Howard testified that this encounter made him feel scared and that he felt threatened by Steve and "had a genuine fear for [his] physical safety and harm." The Court finds this testimony unbelievable. After the interaction with Steve where Howard was supposedly fearful for his wellbeing, Howard continued to reach out voluntarily to Steve throughout Steve's entire visit in Miami, with cheery and friendly texts. Howard testified that this continuing exchange was so that he could keep track of when Steve left Miami. The Court is not convinced. Moreover, even if this Steve person had been sent as a threat to Howard or even if Howard truly believed he had been sent as a threat that does not provide any excuse for the actions Howard took related to the Carlos Trust vehicles and clearly has nothing to do with Howard's improper use of the Carlos Trust vehicles.

Meanwhile, unbeknownst to Carlos or the Carlos Trust, on March 10, 2021 Collection Miami conveyed title to the Phantom to Motorcar Atlanta, the day after Howard took the car from Carlos' apartment to do the blackout work. Motorcar Atlanta is the Howard Entity that had the floorplan financing arrangement with NextGear. At the point of that transfer, the Phantom became subject to the floorplan financing, and on March 11, 2021, Howard took $250,000.00 from the financing line which money was then used to pay off the NextGear financing secured by the Ferrari.

On May 18, 2021 the Phantom was in the possession of Manheim and was apparently listed on its auction site for sale, which could only be done at the request of Motorcar Atlanta.  On or about May 24, 2021 the Carlos Trust learned that the Phantom was listed on the Manheim auction site and Manheim was notified that the Phantom had been reported as stolen.  Lisa Harper also sent a cease-and-desist letter to Howard's attorneys.  Based on the notice that the Phantom had been stolen, on May 25, 2021 the car was removed from Manheim's auction site.

However, Manheim's records also show that Howard advised Manheim that the Phantom was removed from auction because it was sold.  Apparently, the Phantom was sold on May 19, 2021, without providing any notice to Carlos or the Carlos Trust. Motorcar Miami sold the Phantom to Chicago Motor Cars ("Chicago") for $450,000.00, at which time Chicago sent payment via wire to Collection Miami's bank account, notwithstanding that, at that time, the Phantom was titled in the name of Motorcar Atlanta.

14

Howard never gave any of the money from the sale of the Phantom to Carlos or the Carlos Trust. Rather, Howard used $250,000.00 to pay NextGear and the balance of the funds Howard testified he used to pay his legal fees arising in connection with the dispute with Carlos and the Carlos Trust.[13]

### THE STATE COURT ACTION

On June 14, 2021 the Carlos Trust sued Howard, Motorcar Atlanta, Motorcar Miami, and Collection Miami in the Circuit Court in and for Miami Dade County Florida under Case No. 2021-013915-CA-01 for what the Carlos Trust alleged was the defendants' (i) wrongful retention of proceeds from the sale of his vehicles, and (ii) failure to transfer title of purchased vehicles to him, including (a) the Ferrari and (b) the Phantom (the "State Court Action").

Pursuant to an agreed stipulated consent order dated June 21, 2021 (the "Consent Order") in the State Court Action, Howard was required to provide, by June 24, 2021, extensive information and documents describing the circumstances of any sale or attempted sale of the Phantom.

Although Howard partially complied with the Consent Order, Howard failed to fully provide certain documentation required by the Consent Order, which prompted the Carlos Trust to file a motion for contempt in the State Court Action.

The state court issued an order to show cause requiring full compliance with the Consent Order by July 27, 2021; appointed a third-party neutral on

---

[13] Regardless of whether Howard was justified in his fears about Carlos, neither he nor the Howard Entities had the right to use the funds received from the sale of the Phantom to pay legal fees or other expenses. That money, like the Phantom, belonged to the Carlos Trust.

July 30, 2021 to assist with identifying and turning over the required information; and issued another order setting final deadline requiring compliance by August 27, 2021. According to the state court, all of "these efforts were unsuccessful at achieving [Howard's] full compliance" in the State Court Action.

On October 22, 2021 the state court ultimately held Howard, Motorcar Miami, and Collection Miami in contempt for failing to provide documents and information to which they had access, as required by multiple court orders (the "Contempt Order"). The state court specifically found that Howard, Motorcar Miami, and Collection Miami "failed to provide readily available information" and that Howard's "testimony [was] not credible." The Contempt Order awarded the Carlos Trust attorneys' fees and costs; but this bankruptcy case was filed on the same day the state court was to conduct a hearing on the fee amount. For purposes of this Adversary Proceeding, the parties have stipulated that the amount of recoverable fees and costs is $100,000.00.

Motorcar Atlanta filed for chapter 7 bankruptcy in the Northern District of Georgia on June 22, 2021 under Case No. 21-54734-JWC (the "Motorcar Atlanta Bankruptcy").

Motorcar Miami and Collection Miami were each administratively dissolved by the State of Florida on September 23, 2022, and September 24, 2021, respectively.

## **CONCLUSIONS OF LAW**

16

The Complaint includes four counts directed to denying the discharge of Howard's debts to the Carlos Trust: Count I - to except the Phantom Debt and the Vehicle Sales Debt from discharge under section 523(a)(2)(A) for false pretenses, false representations, or actual fraud; Count II - to except the Phantom Debt and the Vehicle Sales Debt from discharge under section 523(a)(4) for embezzlement or larceny[14]; Count III - to except the Phantom Debt and the Vehicle Sales Debt from discharge under section 523(a)(6) for willful and malicious injury; and Count IV - to except the Contempt Debt from discharge under section 523(a)(6) for willful and malicious injury.  Count V seeks to pierce the corporate veil between the Howard Entities and Howard such that all debts arguably owed by any of the Howard Entities to the Carlos Trust are debts for which Howard should be held personally responsible.

Section 523(a)(2)(A) generally requires "the traditional elements of common law fraud." *SEC v. Bilzerian* (*In re Bilzerian*), 153 F.3d 1278, 1281 (11th Cir. 1998). To prevail, a creditor must prove that: "(1) the debtor made a false representation to deceive the creditor, (2) the creditor relied on the misrepresentation, (3) the reliance was justified, and (4) the creditor sustained a loss as a result of the misrepresentation." *Id.* at 1282. The first element requires a showing of fraudulent intent. *Federal Trade Commission v. Ettus* (*In re Ettus*), 596 B.R. 405, 411 (Bankr. S.D. Fla. 2018). Fraudulent intent can be shown by

---

[14] While the Complaint sought recovery under section 523(a)(4) for embezzlement and alternatively for larceny, the Carlos Trust only discussed its claim for embezzlement in its proposed findings of fact and conclusions of law submitted to the Court. Therefore, the Court deems the Carlos Trust's larceny claim is abandoned and this Opinion will only address the claim for embezzlement.

the totality of the circumstances, and encompasses a broad range of conduct, including "orchestrating" or "actively and knowingly participat[ing] in a fraudulent scheme." *Id.* at 411.

Section 523(a)(2)(A) also applies to debts arising from false pretenses. False pretenses may encompass implied misrepresentations or conduct intended to create and foster a false impression. *Ershowsky v. Freedman* (*In re Freedman*), 431 B.R. 245, 256 (Bankr. S.D. Fla. 2010). "As with actual fraud and false representation, creditors seeking redress for false pretenses under § 523(a)(2)(A) must demonstrate justifiable reliance." *Bach v. Cabot* (*In re Cabot*), 644 B.R. 232, 238–39 (Bankr. S.D. Fla. 2022); *City Bank & Trust Co. v. Vann* (*In re Vann*), 67 F.3d 277, 283-84 (11th Cir. 1995).

Under section 523(a)(4), "embezzlement" is "the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *Moore v. United States*, 160 U.S. 268, 269 (1895). "A creditor proves embezzlement by showing that (1) he entrusted property to the debtor, (2) the debtor appropriated the property for a use other than that for which it was entrusted, and (3) the circumstances indicate fraud." *F&F Investments Group, LLC v. Case* (*In re Case*), 636 B.R. 852, 858 (Bankr. S.D. Fla. 2022) (internal citations omitted); *see also FJK Tee Jay Ltd. v. Keitel* (*In re Keitel*), 2018 WL 9597494 *3 (Bankr. S.D. Fla. 2018).

For a debt to be nondischargeable under section 523(a)(6), the debtor must have intended a deliberate or intentional injury. "The word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate

or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). The Eleventh Circuit has held "A debtor is responsible for a 'willful' injury when he or she commits an intentional act the purpose of which is to cause injury or which is substantially certain to cause injury." *In re Jennings,* 670 F.3d 1329, 1334 (11th Cir. 2012).[15] In determining the non-dischargability of a section 523(a)(6) claim based upon willful and malicious injury, a subjective standard, requiring a creditor to prove that a debtor actually knew that the act was substantially certain to injure the creditor, applies. *Interamerican Asset Management Fund Limited v. Ortega* (*In re Ortega T.*), 573 B.R. 284, 296 (Bankr. S.D. Fla. 2017).[16]

---

[15] The Court has stated several times that *Jennings*, and, subsequently the Eleventh Circuit's decision in *In re Kane*, 755 F.3d 1285 (11th Cir. 2014), referred back to the holding in *In re Walker,* 48 F.3d 1161 (11th Cir. 1995) without due consideration for the *Geiger* holding. *Walker* predates *Geiger* and while *Walker* clearly shows that the Eleventh Circuit was in the camp of those cases consistent with the Eighth Circuit standard adopted in *Geiger*, *Walker* still focused on an ACT, which was rejected by *Geiger*, and the substantial certainty of such ACT to cause injury. Indeed, Judge May, in *In re McClung*, 335 B.R. 466 (Bankr. M.D. Fla. 2005) (a case that predates *Jennings* and *Kane*) recognized that substantial certainty is NOT an appropriate analysis anymore in light of *Geiger* – there must be proof that the debtor intended to injure the creditor. However since "substantial certainty" is the standard the Court must use, right or wrong, (and apparently the Eleventh Circuit is not the only circuit that appears to have engaged in *Geiger* backtracking) the question is, what does "substantial certainty" mean? In *Jennings,* and again in *Kane,* the Eleventh Circuit wrote "Our sister circuits have disagreed about whether the term "substantial certainty" is a subjective standard, requiring a creditor to prove that a debtor actually knew that the act was substantially certain to injure the creditor, or an objective standard, requiring a creditor to show only that a debtor's act was in fact substantially certain to cause injury." But the Eleventh Circuit has never ruled which test applies.

[16] The subjective standard of substantial certainty comes close to the Supreme Court's holding in *Geiger* which requires a deliberate and intentional injury.

### HOWARD IS PERSONALLY LIABLE FOR THE DEBTS

Howard argues that he is not personally liable for any of the claims asserted by the Carlos Trust because the debts are owed by one or more of the Howard Entities.  While a corporate entity may shelter a principal or officer of a corporation under most circumstances, that insulation is not limitless.  Howard is personally liable for the Claim regardless of whether those debts are technically owed by the Howard Entities because Howard was actively involved in the wrongful conduct giving rise to the Claim; indeed he is the sole actor perpetrating the harm on the Carlos Trust, and therefore Howard cannot hide behind a corporate shield or escape his personal liability for the harm to the Carlos Trust. *See In re Firestone*, 26 B.R. 706, 714 (Bankr. S.D. Fla. 1982). Moreover, the Carlos Trust has proved that Howard disregarded all corporate formalities, treated each and all of the Howard Entities interchangeably, and used the corporate structure for improper purposes, such that it is appropriate to pierce any corporate veil behind which Howard seeks to shield himself. *See Dania Jai-Alai Palace, Inc. v. Sykes*, 450 So. 2d 1114, 1119-20 (Fla. 1984).

In *Firestone,* the debtor Firestone had run a company that, at one point, had several hundred employees, selling photo processing franchises. Those franchise interests were sold through hired "locators".  Various courts found that the franchisees were defrauded.  Firestone argued he should not be held personally liable for the judgments obtained by the franchisees.  However, the bankruptcy court held that Firestone was personally liable for the judgments obtained against his various corporations based in part on acts performed by

other employees because "an officer, director or shareholder of a corporation will not be shielded by the corporate form from liability for a tort, including fraud, in which he himself is involved." *Firestone*, 26 B.R. at 714. The bankruptcy court quoted from the Tenth Circuit:

> It is the general rule that if an officer or agent of a corporation directs or participates actively in the commission of a tortious act or an act from which a tort necessarily follows or may reasonably be expected to follow, he is personally liable to a third person for injuries proximately resulting therefrom. But merely being an officer or agent of a corporation does not render one personally liable for a tortious act of the corporation. Specific direction or sanction of, or active participation or cooperation in, a positively wrongful act of commission or omission which operates to the injury or prejudice of the complaining party is necessary to generate individual liability in damages of an officer or agent of a corporation for the tort of the corporation.

*Id.* (quoting *Lobato v. Pay Less Drug Stores, Inc.,* 261 F.2d 406, 408-9 (10th Cir. 1958)). The *Firestone* court found the debtor personally liable finding that "[t]he evidence both of numerous specific acts of participation by the debtor and his overall control of the operation, leading to the inference of further involvement, makes it clear that personal liability is proper here." *Firestone,* 26 B.R. at 714; *see also Special Purpose Accts. Receivable Co-op Corp. v. Prime One Cap. Co.,* 125 F. Supp. 2d 1093, 1105 (S.D. Fla. 2000) ("Florida courts uniformly hold that if an officer, director, or agent commits or participates in a tort, whether or not his actions are by authority of the corporation or in furtherance of the corporate business, that individual will be liable to third persons injured by his actions, regardless of whether liability attaches to the corporation for the tort.").

Howard was not acting within the scope of his corporate role when he lied to the Carlos Trust about when the Mercedes and the Porsche were sold, or when he took money for vehicles, issued bills of sale, but still treated the sold vehicles as corporate assets by failing to record title documents in the name of the Carlos Trust. Howard's excuse regarding the taxes (which Howard didn't even raise with respect to his multi-financing with the Ghost) is just an excuse that Howard used to try to justify what he did. The representative from Holman, when asked about selling a vehicle without getting the tax funds and information from a client, testified that if a client had given Holman any funds, that money would be returned to the client and the transaction canceled. When asked whether Holman would retain the funds but not deliver the title, the Holman representative responded, "Absolutely not!".

It was Howard that sold the Phantom, allegedly for unpaid invoices, without notice to Carlos or the Carlos Trust (wrongfully claiming ownership of the vehicle), and then keeping the proceeds of the sale, including to pay off a debt that Howard had no right to secure with the Phantom. Having personally committed all of these wrongful acts, Howard is personally liable for the Claim.

As the *Firestone* court pointed out, finding Howard is personally liable for the wrongful acts committed, "is made on a different legal basis from that of piercing the corporate veil." *Firestone,* 26 B.R. at 714. Piercing the corporate veil is an exception to the general principle of corporate law that shareholders of a corporation are protected against personal liability for corporate obligations "unless it be shown that the corporation is formed or used for some illegal,

fraudulent or other unjust purpose which justifies piercing the corporate veil."

*Dania Jai-Alai Palace, Inc.*, 450 So. 2d at 1121.  To pierce the corporate veil under

Florida law, three factors must be satisfied:

> (1) the shareholder dominated and controlled the corporation to such an extent that the corporation's independent existence was in fact non-existent and the shareholders were in fact alter egos of the corporation;
> (2) the corporate form must have been used fraudulently or for an improper purpose;
> (3) the fraudulent or improper use of the corporate form caused injury to the claimant.

*Gasparini v. Pordomingo*, 972 So. 2d 1053, 1055 (Fla. 3d DCA 2008) (internal

citations omitted).

The Court finds that it is appropriate to "pierce the corporate veil" and,

consequently, Howard is also personally liable for any obligations of the Howard

Entities.  The Court finds that Howard disregarded corporate formalities with

respect to his personal obligations as well as disregarded the separateness of his

various corporate entities.  Howard used the corporate funds to pay for personal

expenses.  Howard used a dealer license issued in the name of Motorcar Miami

and held it out as the dealer license for Collection Miami.  Howard used the funds

of all the Howard Entities interchangeably.  Howard claimed he was using

Collection Miami as a d/b/a for Motorcar Miami or was "in the process of"

merging the two companies but no documents were ever filed with the State of

Florida. Howard claimed that he could not produce any records of a merger

application or d/b/a application because those documents were left in Howard's

office from which he was evicted and to which he had no access.

In addition to disregarding any corporate formalities, Howard also used the Howard Entities for an improper purpose. The evidence is indisputable that Howard used the Howard Entities as part of his scheme to use Carlos Trust vehicles to obtain financing, to defraud NextGear,[17] to defraud the Carlos Trust, and to achieve a personal benefit. By using the Carlos Trust money and cars improperly, and ultimately wrongfully selling the Phantom once the shell game had run its course, Howard benefitted personally because NextGear was paid in full and Howard was therefore off his personal guarantee. Moreover, the Court finds that Howard used the money from the various Howard Entities to support his personal expenses. Howard's testimony that the personal expenses showing up on the Howard Entities' bank accounts were for entertaining clients, like most of Howard's other claims, is just not believable.

## THE PHANTOM DEBT IS NOT DISCHARGEABLE

The Phantom Debt is not dischargeable under sections 523(a)(2), (a)(4) or (a)(6). Howard sold cars to the Carlos Trust and was paid in full for those cars. In each instance Howard sold the car to the Carlos Trust, issued a bill of sale, but never signed or recorded the title document in the name of the Carlos Trust. Howard did this for personal gain without regard to what harm it might cause to the Carlos Trust. That is, until the final round – the Phantom round.

---

[17] Howard argues that even if the evidence shows that Howard may have defrauded NextGear, that isn't enough to pierce the corporate veil with respect to the Carlos Trust. While that argument may be legally correct, it is not factually correct as the Court finds the Howard Entities were also used to defraud the Carlos Trust.

Howard makes much of the fact that dealer floorplan financing is nothing unusual.  Howard is correct.  What *is* unusual is using a sold car as company inventory for the purpose of obtaining funds for the benefit of the dealer. The fact that Howard testified keeping up financing was necessary for him to maintain his "Diamond-Dealer" status with NextGear so he could have lower financing rates is not a benefit to anyone other than Howard and the Howard Entities.  And it is certainly no excuse for using vehicles that had already been sold to, and paid in full by, the Carlos Trust.

Howard's argument that the Ferrari title and the Phantom title could not be recorded due to indecision about where to register those two cars doesn't alter the fact that the cars were sold to the Carlos Trust.  Those cars belonged to the Carlos Trust regardless of whether the certificate of title was recorded in the name of the Carlos Trust.  The failure of the title to be recorded might protect NextGear if it took a car pledged as collateral if unpaid, but as between the Carlos Trust and Howard, the recording of the title wasn't necessary for those vehicles to have been sold to the Carlos Trust and for title to pass to the Carlos Trust.  Indeed, Howard acknowledged as much when, in response to questioning by Plaintiff's counsel, Howard testified that if a car was on floorplan and the dealer went out of business "Mr. Carlos would contact NextGear, he'd show them the bill of sale, whatever, and they'd overnight title."

Section 319.22 of the Florida Statutes governs transfers of title to motor vehicles and provides that "a person acquiring a motor vehicle . . . shall not acquire *marketable title* to the motor vehicle . . . until he has issued to him a

certificate of title to the motor vehicle." F.S. §319.22(1) (emphasis added); *see also Special Purpose Accts. Receivable Co-op Corp.*, 125 F. Supp. 2d at 1102 (holding that a certificate of title is not necessary to assert ownership over a motor vehicle); *In re Orange Rose, LLC,* 446 B.R. 543, 546–47 (Bankr. M.D. Fla. 2011) ("the failure of the purchaser to obtain the title certificate at the time of sale does not prevent the passage of title from the seller to the buyer. While [section 319.22] provides that a purchaser shall not acquire 'marketable' title until a certificate of title is issued, the statute does not provide that no *valid* title shall be perfected until [that time].") (internal citations and quotations omitted). Therefore, the Carlos Trust owned both the Ferrari and the Phantom even without obtaining a certificate of title.

The Court finds that Howard sold the Phantom to the Carlos Trust with no intention of actually delivering title to the Phantom, consistent with the manner in which Howard had obtained funds from the Carlos Trust for vehicles in the past. There is no question that the Carlos Trust assumed when it paid for the Phantom in full that it was purchasing the Phantom and would be the owner of the Phantom. Although the loss in this instance is limited to the value of the Phantom (and associated attorney fees), that is solely a function of timing, and Howard's use of the Carlos Trust property as part of the shell game. Howard's intent to deceive is evident in his pattern of selling vehicles without actually issuing a certificate of title so he could use the vehicles to obtain money for himself and his businesses, and his hiding the fact. Thus, the Phantom Debt is non-dischargeable under section 523(a)(2)(A).

The Court also finds the Phantom Debt is non-dischargeable under section 523(a)(4). The Carlos Trust entrusted Howard with the Phantom to perform the blackout services. Yet the day after Howard took the Phantom from the Miami condominium and days before Howard testified Carlos threatened him, Howard purported to transfer title of the Phantom from Collection Miami to Motorcar Atlanta, used a fake bill of sale with a made-up sales amount, and submitted the Phantom as collateral for a $250,000.00 loan (the maximum financing NextGear will provide with respect to any one vehicle). According to the NextGear representative, Howard had to have possession of the vehicle in order to get the financing.[18] All of this was done without the knowledge or consent of the Carlos Trust and was concealed by Howard.

Finally, the Court finds the Phantom Debt is non-dischargeable under section 523(a)(6). By the time Howard sold the Phantom to Chicago he knew that his sale of the Phantom was going to cause the Carlos Trust harm. Howard knew by that time that the shell game was over and there would be no other cars that he could use to pay off the NextGear loan secured by the Phantom. Even if Howard had given the Carlos Trust back the balance of the funds he received for selling the Phantom after paying NextGear, the amount left was nowhere near the amount of money the Carlos Trust paid for the Phantom. And Howard's excuse that he had a right to sell the Phantom to pay the alleged unpaid invoices, for the Vehicle Tax Fees and the Custom Work Fees, rings hollow, when rather than

---

[18] Of course, since Howard fabricated bills of sale and other documentation to get the financing secured by NextGear, it is unlikely he was concerned about truthfully stating the Phantom was in his possession.

applying the "$14,725.99" that Howard claims is all it would have taken to settle this matter, and returning the balance of the sales proceeds from the Phantom to the Carlos Trust, Howard spent it all.  The facts show that not only was Howard substantially certain that his sale of the Phantom would harm the Carlos Trust, but also that Howard actually intended to cause the Carlos Trust harm when he sold the Phantom.

## THE VEHICLE SALES DEBT IS NOT DISCHARGEABLE

Howard was entrusted with the sales of the Porsche and the Mercedes. Howard did not turn over the sales proceeds from either vehicle when they were sold and lied about having received the money.  Howard's excuse that he was holding onto the proceeds to use for a trade later on to save taxes for the Carlos Trust rings hollow in the face of the arbitration lie.  If, in fact, there was a good reason to hold onto the proceeds there would have been no reason for Howard to lie.  Thus, pursuant to section 523(a)(4) the Vehicle Sales Debt is not dischargeable.

## THE CONTEMPT DEBT IS NOT DISCHARGEABLE

The Court agrees with Howard that the Contempt Order does not include the necessary elements for finding that the Contempt Debt constitutes a non-dischargeable debt because the Contempt Order does not make any findings regarding maliciousness.[19] *See Liddell v. Peckham* (*In re Peckham*), 442 B.R. 62, 84 (Bankr. D. Mass. 2010) (finding that "in the absence of collateral estoppel,

---

[19] The Court ruled at the Trial that the Contempt Order made findings of willfulness sufficient for collateral estoppel purposes.

[contempt sanctions] must be based on conduct of the debtor that is both willful and malicious for [those sanctions] to be nondischargable under § 523(a)(6) and that the surrounding circumstances will determine the true nature of the debtor's conduct."). Thus the Plaintiff was required to prove Howard acted maliciously such that the Contempt Debt is non-dischargeable.

While the Court finds (as did, apparently, the state court) that it is incredible that Howard cannot remember where his office was where the records were supposedly abandoned (among other excuses), the Plaintiff has failed to prove that Howard intended to harm the Carlos Trust in the form of excess attorney fees by failing to comply with the discovery requests and state court orders. Because section 523(a)(6) requires a specific intent, or substantial certainty, to cause the harm, the Court finds the Plaintiff has not met its burden.

However, because the Court has held that the Phantom Debt and the Vehicle Sales Debt are not dischargeable, and the Contempt Debt constitutes attorney fees arising in the State Court Action related to the Phantom Debt and the Vehicle Sales Debt, the Contempt Debt is not dischargeable. *See Harry Bradford Barrett Residuary Trust, et al. v. Barrett* (*In re Barrett*), 410 B.R. 113, 123–24 (Bankr. S.D. Fla. 2009).[20]

---

[20] Howard argued that the Contempt Order is not a final order and therefore the fee award cannot be considered final. The Court ruled at the Trial that the Contempt Order was final.

### THE AFFIRMATIVE DEFENSES

The Affirmative Defenses remaining after the Court's partial ruling on summary judgment are (a) reliance on advice of counsel; (b) setoff; (c) recoupment; (d) unjust enrichment; (e) equitable estoppel; and (f) promissory estoppel. Howard argues in support of these remaining affirmative defenses that (1) any actions taken by him to protect the Howard Entities' business interests were upon advice of counsel and as such, Howard lacked the scienter to have violated any of the counts of the Complaint; (2) he is entitled to recoup or setoff the Vehicle Tax Fees and the Custom Work Fees that the Carlos Trust owes to the Howard Entities; (3) the Carlos Trust has been unjustly enriched because it continues to drive around in cars that were improved by the custom work performed by the Howard Entities for which work the Carlos Trust has not paid; and (4) the Carlos Trust is estopped from claiming it didn't owe taxes and doesn't owe for the custom work on the vehicles because Howard detrimentally relied on the Carlos Trust's promise to pay for same.

Howard had the burden of proving the Affirmative Defenses at the Trial. *See Thorsteinsson v. M/V Drangur*, 891 F.2d 1547, 1551 (11th Cir. 1990). However, Howard has failed to meet his burden of proof with respect to any of the remaining Affirmative Defenses.

Howard failed to provide any evidence to support his affirmative defense that he relied on advice of counsel. Other than Howard's self-serving testimony, which this Court has already found is unreliable, Howard did not provide any type of evidence to support this claim. Howard did not produce any letters or

emails or even identify the lawyers upon whose advice he relied. Howard did not put on the testimony of any of the lawyers who supposedly provided the advice. Moreover, Howard could not even identify what exactly was the advice of counsel he received, other than testifying that his sale of the Phantom, including everything he did or did not do with respect to that sale, was based on such advice of counsel.

Similarly, Howard failed to provide any evidence at Trial to support his affirmative defenses of unjust enrichment, equitable estoppel, or promissory estoppel. Moreover, Howard did not address these affirmative defenses in his proposed findings of fact and conclusions of law submitted to the Court, even after the failure to do so was pointed out by Plaintiff's counsel in its proposed findings of fact and conclusions of law, to which Howard had the opportunity to respond. Therefore, the Court assumes Howard has abandoned these affirmative defenses.

Howard's affirmative defenses of setoff and recoupment are similarly flawed. In order to sustain a defense or claim for recoupment the creditor must prove that: (1) the mutual debts arose from the same transaction; (2) the creditor is asserting recoupment as a defense; and (3) the "main action" is timely. *See Smith v. American Financial Systems, Inc.* (*In re Smith*), 737 F.2d 1549, 1553 (11th Cir. 1984). Recoupment may apply when "the claims of the debtor and creditor are so intertwined, so integrated in one transaction, that equity essentially recognizes that the obligations are merged—as if they cease to exist independently of one another." *In re First Foliage, L.C.,* 2014 WL 2616618, at *11

31

(Bankr. S.D. Fla. 2014). Howard did not pay any Vehicle Tax Fees on behalf of the Carlos Trust and therefore he has no basis to seek recoupment or setoff regarding the payment of taxes.  While the Custom Work Fees stem from the same relationship and ultimate dispute between Howard and the Carlos Trust, the Custom Work Fees do not arise from the same transaction as the Claim asserted by the Carlos Trust. Any Custom Work Fees that Howard claims remain unpaid either relate to the work allegedly performed on the Phantom, which, according to Howard wasn't even the property of the Carlos Trust, or allegedly performed on vehicles for which the Carlos Trust has not included any damages as part of the Claim.  And to the extent that there was even a remote claim by Howard for the alleged work done on the Phantom, that debt was satisfied at least a hundred times over by the sale of the Phantom.  Therefore Howard has failed to demonstrate that he has any right of recoupment.

"Three elements must be present for the right of setoff to arise pursuant to the plain and unambiguous language of Section 553(a): (i) the parties must have mutual debts owing to each other; (ii) the debts arose prepetition; and (iii) the setoff cannot fall within the three exceptions of Sections 553(a)(1), (2), or (3)." *In re McKay*, 420 B.R. 871, 877 (Bankr. M.D. Fla. 2009). The only evidence submitted by Howard to support his defense are the two invoices- one for the Vehicle Tax Fees, which was never paid by Howard, and one for the Custom Work Fees. With respect to the Custom Work Fees, Howard is not entitled to setoff any charges.  Howard did not submit any evidence to substantiate his affirmative defense of setoff for the Custom Work Fees. As the Court has already noted,

Howard is not entitled to any recovery on account of any custom work allegedly performed on the Phantom. The Carlos Trust disputed the charges on the Custom Work Fees invoice because (a) the invoice appeared to be back dated and (b) Howard failed to provide any supporting documentation for the alleged expenses after Carlos requested the support. At Trial, Howard still was unable to provide any back up to support the charges in the invoice, including the actual value of such services or whether Howard actually paid any vendor or third-party installer for such work or services. Although the parties stipulated that the Carlos Trust agreed to pay for custom work for the Ferrari, the Court finds that the invoice alone (the accuracy of which is disputed by the Carlos Trust), fails to satisfy Howard's burden to substantiate the amount of the setoff claim. *See In re Challa*, 186 B.R. 750, 761 (Bankr. M.D. Fla. 1995) ("The burden of proof rests on the party articulating a right to setoff.") (internal citations and quotations omitted); *McKay,* 420 B.R. at 881.[21]

## **CONCLUSION**

While the purpose of bankruptcy is to provide a debtor with a fresh start, as this Court has written time and again, bankruptcy, and its fresh start, are for the "honest but unfortunate debtor." *Grogan v. Garner*, 498 U.S. 279, 287, (1991). While there is no question that Howard is unfortunate, he is not honest.

---

[21] The "I couldn't get my documents from the landlord" excuse rings hollow. Like the state court, the Court finds unbelievable that Howard could not remember the location of his former office (which would have made it possible to identify the landlord or at least the property manager), and made no effort to try to locate those documents, either for the state court or this Trial.

And Howard's misfortune is of his own making.  The facts presented at Trial are overwhelming.  Mr. Howard is not entitled to discharge of the Carlos Trust Claim.

Counsel for the Carlos Trust is directed to prepare a final judgment consistent with this Memorandum Opinion.

# # #

Copies furnished to:
Jenea M. Reed, Esq.
Ivan J. Reich, Esq.

*Attorney Reed is directed to serve a copy of this Order on interested parties who do not receive service by CM/ECF, and file a proof of such service within two (2) business days from entry of the Order.*